No. 15.—GEORGE J. KOLLOCK, *et al.* plaintiffs in error, *vs.* JOHN JACKSON, defendant.

[1.] Possession of the property is necessary to create the *factor's lien*, but that may be either actual or constructive.

[2.] In Georgia, *judgments* bind all the property owned by the defendant, from their date, as well that subsequently acquired as that owned at the time of signing the judgment; and the *lien of judgments* has precedence over, and is paramount to the *lien* of a *factor* upon property in his possession.

[3.] A *judgment lien* does not vest the legal title of the property of the defendant in the plaintiff, but it gives him a special interest in it, which may be asserted and realized by levy and sale, to the exclusion of all adverse junior liens and incumbrances, and a perfect title to the property passes to the purchaser at such sale, whether the creditor or another, through the sheriff's deed, which relates back to the date of the judgment.

In Equity, in Baker Superior Court, tried before Judge WARREN, June Term, 1848.

The facts are found in the opinion of the Court.

HINES & HINES, LYON & CLARK, and E. R. BROWN, for plaintiffs in error, cited and commented on the following authorities:

1st. As to possession. *Story on Agency*, 373, 374. 2 *Kent*, 637, 638. 1 *Starkie*, 330. *Water vs. Birch*, 6 *T. R.* 142. 6 *Wheeler's C. L.* 449. 2 *Tomlin's Law Dict.* 443. *Kinlock vs. Craig*, 3

*T. R.* 57.   *Cross on Lien, Russell on Lien,* 32.   *Montague on Lien,* 22.

2d. As to factor's lien.   1 *Peters,* 443.   6 *Ibid,* 505.   12 *Wheat.* 506.   *R. M. Charlton's Rep.* 72, 325.   8 *T. R.* 99.   3 *Wheeler,* 450.   *Prince,* 476.   1 *Kelly,* 266.   *Lambert vs. Paulding,* 18 *J. R.* 311.   1 *Stark,* 123.   2 *Atk.* 113.   7 *East,* 5.

SULLIVAN, for defendant in error.

*By the Court.*—NISBET, J. delivering the opinion.

The complainant, John Jackson, entered into an agreement with one of the defendants, George H. Johnston, by which the latter was to consign his crop of cotton to the former, at Albany in Baker county; Jackson was to furnish goods to Johnston, and make advances in cash, and the cotton was to be held as security for both; subsequently, the agreement was so modified as to authorise the delivery of the cotton at Newton instead of Albany, and it was there delivered to a person by the name of James Johnson.    Goods were furnished by Jackson to George H. Johnston, and advances made, according to the agreement.    Subsequently, the cotton was levied upon by executions against George H. Johnston, and sold, and the money claimed by creditors holding judgments older than the advances made by Jackson, and older than the judgments which brought the money into Court. This bill is filed by Jackson against George H. Johnston and his judgment creditors, to have this fund paid to him, on account of his *lien as factor.*

[1.] Three points are made in the case, and the first that I shall notice, arises out of the following instruction of the Court to the jury: " If the crop of cotton of 1845 was delivered at Newton, at the ware-house of James Johnson, *so that the complainant could control it*, then the lien thereon, if delivered in pursuance of the previous understanding, as proven, was perfect for the advances made by Jackson."    This charge is to be taken in reference to the testimony.    Whether the cotton was, in fact, delivered at Newton, in pursuance of the agreement between Jackson and George H. Johnston, or whether delivered there by George H. Johnston to James Johnson, as his agent, irrespective of that agreement, was a question mooted before the jury, and left somewhat in doubt by the testimony.    The settlement of that question

of fact was well left by the Court to the jury. To transpose the language of the Court a little, and a little to change it, the Court meant to say, " if you, the jury, believe that the cotton was delivered at Newton, to Jackson, in such way as to give him the control of it in pursuance of his agreement with George H. Johnston, then his (Jackson's) lien on it for his advances, became perfect by such delivery." The question made is, whether a *constructive* possession will create the factor's lien. The Court holding that it will, and the counsel for the plaintiffs in error holding that such lien can spring only out of *actual* possession of the goods. We are with the Court. Whilst it may be admitted that the language of the books (that used by Chancellor Kent, for example) leaves this question a little in doubt; yet it may be considered settled that possession, *actual or constructive*, will entitle the consignee to his lien. *Ch. Kent* remarks, that the right of lien does not extend to cases where, *in fact*, the goods of the principal do not come to the hands of the factor. He, however, subsequently makes qualifications of this general proposition, which, in effect, casts his authority against the idea, that *actual possession* is necessary. 2 *Kent's Com.* 637, 8, 9. The rule was liberally, but I have no doubt truly stated by the Court, that where the possession is such, that in law the factor has the right to control the goods—to control their actual custody—the lien exists. The lien is the right to retain an acquired possession. *Possession* is indispensable to its existence ; but that may be constructive as well as actual. *Mr. J. Story*, speaking of this subject, says, " to found a valid lien, there must be an actual or constructive possession of the thing by the party asserting it ;" and again, " neither need the possession always be direct and actual. It is sufficient if it be constructive and *operative in point of law*." See *Story on Agency*, sect. 361. *Chitty on Com. & Manuf.* 547, 548. *Burn vs. Brown*, 2 *Starkie R.* 272. *Smith on Mercan. Law*, 342. *Lucas vs. Dorrien*, 7 *Taunt. R.* 278. *Taylor vs. Robinson*, 2 *Moore R.* 730. *Paley on Agency*, by *Lloyd*, 139, 140. *Lempriere vs. Pasley*, 2 *T. R.* 487. *McCombie vs. Davies*, 7 *East R.* 5. 2 *Bell Comm.* sect. 774, 4 *edit.* 13 *Martin R.* 284. 5 *Binn.* 392. 17 *Mass.* 197. 1 *Atk. R.* 160. 1 *Bos. & Pull.* 563. 4 *M. & S.* 240. 2 *B. & Ald.* 134. 2 *Story's R.* 131.

Again, this lien exists by contract, if at all ; a part of that contract was, that the cotton be delivered at Newton. The jury

were instructed to find whether it was there delivered in pursuance of the contract. The Court was certainly right in charging the law to be, that if it was delivered *in pursuance of the contract*, so that the complainant, Jackson, could control it, the lien attached. Johnston, by contract, concedes a lien, upon delivery at Newton.

The second exception grows out of the admission of the evidence of Mr. Bilbo, the attorney for the plaintiff in those judgments contesting the lien of Jackson upon the cotton. He testifies that he received the executions from the plaintiff, with a letter, directing him to hold them until farther orders—that some time in the year 1845, after he had received the *fi. fas.* Jackson applied to him to know if he would be safe in making advances for George H. Johnston on his crop of cotton, and that he, Bilbo, informed him that he might rest satisfied, that the *fi. fas.* in his hands should not be levied, so as to interfere with his rights.

This testimony, so far as it relates to Mr. Bilbo's promise to Jackson, was excepted to upon the ground that he, Bilbo, as the attorney of the plaintiffs in execution, had no authority to make such an agreement with Jackson, from his clients. The Court overruled the exception, and that is claimed as error. The bill of exceptions is so meagre upon this point, that we are at a loss to know what was determined by the Court. The exception before the Court below, was *to the testimony* generally, as the bill of exceptions discloses. If by that we are to understand an exception to the competency of Mr. Bilbo, as a witness, we do not hold that the Court erred in overruling it, because we think he was a competent witness. If, however, as we are inclined to believe, the exception was meant to exclude his evidence because his instructions as attorney, did not authorize him to make the arrangement which he did make with Jackson, and therefore, the arrangement was not binding upon the plaintiffs in the executions, *we then say* that it does not appear from the record, that the presiding Judge expressed any opinion upon that subject, and for that reason we shall express none. The *ground* of the exception to this evidence, is stated *arguendo* in the assignment, and from that, we learn what point was intended to be presented to the presiding Judge; but it no where appears from the record, that he understood it in that light, or expressed any opinion, as to the

extent of Mr. Bilbo's authority, or as to the legal effect of the assurances which he gave to Jackson. Thus in the dark we think it but just to the presiding Judge, to leave this question where we find it. It will do the parties no harm so to leave it, as we shall send the case back upon another point. If it is found desirable, this point can be again made, in a form so distinct, as to enable us rightfully to adjudge it.

[2.] The question upon which both sides seem principally to rest this cause, is, whether the lien of the judgments, older than the lien of the factor, shall prevail over the factor's lien? The Court determined that the factor's lien prevails over the lien of judgments. We think differently, and upon this point must remand the cause.

By the Judiciary Act of 1799, " all the property of the party against whom a verdict shall be entered, shall be bound from the signing of the first judgment." *Prince*, 426. This provision of the Act of '99 is substantially re-enacted by the Act of 1822. *Prince*, 451. By the Act of 1789, all the property of the defendant in execution was bound from the signing of the judgment. *Watk. Dig.* 391. So by the Act of 1792. *Watk. Dig.* 481. By the Act of 1797, the property of the defendant was bound from the day of obtaining the verdict upon which the judgment is founded. The Act of 1799, is the law upon this subject. By the law of this State, the lien of the judgment begins at its date, and attaches to all the property of the defendant, owned at that time, and to all by him subsequently acquired.

[3.] By this lien the plaintiff in execution does not acquire the legal title to the property of the defendant in execution. It gives him a special interest in it, which he has a right to assert, by levy and sale, and when the property is brought regularly to sale, the legal title passes to the purchaser, through the sheriff's deed. The lien gives a right to levy to the exclusion of all subsequent and adverse interests, and of all subsequent incumbrances. And by a levy and sale, the title of the purchaser relates back to the date of the judgment. The defendant may alien the property, but the title of the alienee, is subject to the incumbrance of the judgment lien. *Brace vs. Duchess of Malborough*, 2 *P. Will.* 491. *Conrad vs. Atlantic Ins. Co.* 1 *Peter's R.* 443. *R. M. Charlton R.* 324. *Bailey and others vs. Mizell*, 4 *Kelly*, 123.

The lien of the judgment constitutes its chief value. It is its

prime attribute. Its supremacy and continuous force is founded in a salutary and beneficial policy. It is that which makes a judgment the subject of investment, and it is that which enables holders humanely to indulge. Nor is this operative lien unjust to subsequent incumbrancers, or purchasers. The judgment is a security of record. Its record is notice to all the world. Purchasers from the defendant are presumed to have notice. So are factors, or other incumbrancers. In our State, it has never been questioned, but that the judgment binds the property, at any time owned by the defendant after its rendition; although in the hands of a *bona fide* purchaser. Such purchaser stands upon as strong, equitable grounds, as a factor; although the reasons drawn from commercial policy may be stronger in favor of the latter than the former. Exceptions to the supremacy of the judgment lien, there are. These exist for the most part by statute. It remains for me to inquire whether a factor's lien for advances made upon goods in his possession is one. It is not by Statute, and if an exception, it must be by Common Law. Here it may be stated, that if it be conceded, that by the Common Law, the factor's lien overrides the lien of the judgment, yet our Statute in that particular, repeals the Common Law. I think it does, for it expressly enacts, and that too, without qualification, that "all the property of the party against whom a verdict shall be entered, shall be bound from the signing of the first judgment."

But I do not think it is true, that at Common Law the lien of a factor has preference over the lien of a judgment. To show this, will involve the necessity of going somewhat into the doctrine of factor's liens.

By the Roman Law, wherever money, or labor, or services had been expended on account of property, the agent, in whose possession the property was, had a lien upon it. This lien was called a privilege, and was greatly favored, and in many instances, it gave a right of priority of satisfaction, even over claims which were antecedent in point of time. Among these favored liens was that of the factor for advances and disbursements. The reason why he was favored, was, that his advancements and disbursements ensured the preservation of the property. "*Hujus enim pecunia salvam fecit, talionis pignoris causam.*" *Dig. Lib.* 20 *tit.*

4, 6, 1, sec. 1, 2.  1 Domat, b. 3, tit. 1, sec. 5, art. 11.  2 Liver-more on Agency, 36, 37.

It is, perhaps, from this source, that the idea has sprung, that the factor's lien was privileged over liens of prior, date. Whether the privilege of the factor, by the Civil Law, extended to a supremacy over prior claims of the character of liens, may be questioned.  If it did, I remark that the Civil Law is not of force in Georgia, except in so far as it had been, at the era of our independence, engrafted upon and become a part of the Common Law.  I do not believe that this feature of it had been engrafted upon the Common Law.

At the Common Law, factors have a general lien upon every portion of the goods of their principal in their possession, and upon the price of such as are lawfully sold by them, and the securities given therefor, for the general balance of accounts between them and their principal, as well as for the charges and disbursements arising upon those particular goods.  This is the general rule.  Paley on Agency, per Floyd, 128, 9, note.  2 Kent. Comm. 640, 3 edit.  2 Livermore Ag. 38.  3 Chitty on Com. and Manuf. 644, 5, 6.  Smith on Mer. Law, 338, 9.  Ambler, 252.  5 B. & Ald. 22, 31, 32.  1 W. Bl. 104.  1 Burrow, 489.  15 Mass. 389, 396.  1 Mason R. 9.  1 Gallis R. 360.  2 Bell Comm. sec. 799, 800, 4 edit, Story on Ag. sec. 376.

The factor's lien may arise by contract, express or implied, by the course of dealing between him and his principal, or it may arise by operation of law.  It is said, and truly, to be founded in a manifest equity, springing out of the relations of the parties, and the acts of the agent; but it has been established, more particularly, because of its tendency to promote the interest of trade and commerce.  Paley on Agency, by Floyd, 128, 129.

To see what is the force and effect of this lien, I inquire what rights are conferred by it, for those rights are the only safe boundaries of its force and extent?  "A lien, (says Mr. Story,) is not in strictness a jus in re or a jus ad rem, but it is simply a right to possess and retain property, until some charge attaching to it is paid."  Story's Eq. Juris. sec. 506.  2 P. Will. 491.  1 Mason R. 221.  2 Roz. R. 355, 357.

The legal title to the property consigned is in the consignor; that is not divested.  We have seen that it is not in case of the judgment, but that the lien of the judgment is an interest in the

property of the defendant, which may be asserted, and realized by sale, under execution, which sale divests the legal title of the defendant, and transfers it to the purchaser, whether he ·be the creditor, or another.   So in case of the factor, his lien is an interest in the property, which ordinarily, can be asserted and realized by retainer.   His security, generally, is in his right to retain, both as against his principal, and his creditors at large.

This right he may use, as a defence to an action brought against him by his principal, for the property, or as a matter of title, or special property, to reclaim the goods, if unlawfully dispossessed of them.

And if he be an agent with authority to sell, and the goods are sold by him, he may retain the proceeds of the sale, for advances made on them, or plead his advances as an offset in a suit, by his principal, to recover them.   These in general, or ordinarily, are the rights of a factor, growing out of his lien on goods in possession.   *Story on Agency, sec.* 371.

There can be no doubt but that in case of bankruptcy of the principal, the lien of the factor holds goods against his assignees, and as they are trustees of the creditors, good also against them. His advances are made upon the credit of goods in possession— their debts are based upon the personal credit of the bankrupt. His advances, if taken out of the common fund, will leave it equal to what is was before they were made.   His equity is the stronger.   The lien of the factor occupies higher ground than the claim of a creditor existing only in contract.   To this point see the leading case of *Lempriere vs. Pasley,* 2 *T. R.* 490 *to* 496, and the authorities there referred to.

It is true, generally, that the factor cannot sell the goods, without the consent, expressly given or implied, of his principal.   Yet there are cases in which he may sell.   Where goods are delivered to him *for sale,* and he makes advances upon them, he may sell and reimburse himself.   A right to sell may be inferred or implied from the contract between the parties, as where goods are deposited to secure the loan of money, and that is the case before this Court.   In *Pothoniere vs. Dawson, Gibbs, Ch. J.* says : " Undoubtedly, as a general rule, a right of lien gives no right to sell the goods.   But when goods are deposited by way of security, to indemnify a party against a loan of money, it is more than a pledge. The lender's rights are more extensive than such as accrue un-

der an ordinary lien in the way of trade. These goods were deposited to secure a loan. It may be inferred, therefore, that the contract was this, "If I, (the borrower,) repay the money, you must re-deliver the goods, but if I fail to repay it, you may use the security which I have left to repay yourself." 1 *Holt's N. P. R.* 383

Indeed, in many cases where the factor has made advances or incurred liabilities, he may sell to repay these advances and liabilities, without the assent of the owner, if the latter, after due notice of his intention to sell, fail to reimburse him.

The law, upon this subject, is laid down with admirable precision and clearness, by the *Supreme Court of the United States*. That Court say, " Wherever a consignment is made to a factor for sale, the consignor has a right, generally, to control the sale thereof, according to his own pleasure, from time to time, if no advances have been made, or liabilities incurred on account thereof, and the factor is bound to obey his orders. This arises from the ordinary relation of principal and agent. If, however, the factor makes advances, or incurs liabilities on account of the consignment, by which he acquires a special property therein, then the factor has a right to sell so much of the consignment as may be necessary to reimburse such advances, or meet such liabilities, unless there is some existing agreement between himself and the consignor, which controls or varies this right. Thus, for example, if contemporaneous with the consignment and advances or liabilities, there are orders given by the consignor, which are assented to by the factor, that the goods shall not be sold until a fixed time, in such a case the consignment is presumed to be received by the factor, subject to such orders, and he is not at liberty to sell the goods to reimburse his advances or liabilities, until after that time has elapsed. The same rule will apply to orders not to sell below a fixed price, unless, indeed, the consignor shall, after due notice and request, refuse to provide other means to reimburse the factor. And in no case will the factor be at liberty to sell the consignment contrary to the orders of the consignor, although he has made advances, or incurred liabilities thereon, if the consignor stands ready and offers to reimburse and discharge such advances and liabilities. On the other hand, where the consignment is made generally, without any specific orders as to the time or mode of sale, and the factor makes advances or incurs lia-

bilities on the footing of such consignment, then the legal presumption is, that the factor is intended to be clothed with the ordinary rights of factors, to sell in the exercise of a sound discretion, at such time and in such mode as the usage of trade and his general duty require, and to reimburse himself for his advances and liabilities out of the proceeds of the sale; and the consignor has no right, by any subsequent orders, given after advances have been made or liabilities incurred by the factor, to suspend or control this right of sale, except so far as respects the surplus of the consignment not necessary for the reimbursement of such advances or liabilities. Of course, this right to sell or reimburse himself for his advances and liabilities, applies with stronger force to cases where the consignor is insolvent, and where, therefore, the consignment constitutes the only fund for indemnity." *Brown & Co. vs. McGran*, 14 *Peters*, 494, 495. 1 *Holt's R.* 383, *C. M. & S.* 1, 4, 5. *Parker vs. Brancher, decided by Sup. Court, of Massachusetts, at Boston*, 2 *Law R.* 46, *for June*, 1839. 3 *Chitty Com. & Manuf.* 551. 16 *Martin*, 471. 2 *Kent*, 642, 3. 16 *Peter's R.* 129.

Without minute notice of the whole doctrine, as to the rights of a factor under his lien, the foregoing propositions may be considered as an outline of it, sufficient, at least, for the present purpose, and that is to show, that his lien does not supersede prior existing liens. In none of these specifications does his right extend to the displacement of a *prior lien*. What are his rights? To retain the property, as against his principal and his creditors, by contract, to sue for and recover its possession, when unlawfully dispossessed; to plead his lien as against his principal, and with certain qualifications and restrictions to sell the property. But how does he stand when brought into contest with liens? As to future incumbrances and liens, *higher*, but as to anterior liens, upon the very principles upon which his rights rest, *lower*. He is superseded by a lien, which is stronger than his own, is prior in time and better in right. Once concede that the judgment lien attaches upon the future acquisitions of the defendant in execution, and the question is at rest. The very interest and right which the factor acquires in the property, has been already seized and absorbed by the lien of the judgment.

There is nothing in it left, which can constitute a lien, as against the judgment. Why, it may be asked, should a judgment bear

down and annihilate the title of future *bona fide* purchasers, and the lien of future judgments and mortgages, and be itself overridden by a lien, whose equity is no stronger than that upon which they are founded ?   The factor, by his lien, acquires the right to reimbursement, and that is effected by retaining the property, the legal estate remaining in his principal.   Now, that very interest in the same property, the law has set apart and appropriated to the judgment, for the rights of the judgment creditor attach, by operation of law, upon the property, so soon as it is acquired or created.   The lien of the factor is, therefore, wholly incompatible with the lien of the judgment.   Again, whatever rights the factor has in the property, he derives through his principal.   Apart from a principal, there is no agent.   Now, the principal can give no rights except what he himself holds in the property.   And his rights in his own property, are subordinate to the lien of the judgment.   How then can he communicate to his agent, rights or interests in property, which he, himself, does not possess ?

Upon principle and authority, by our own Statute, and by the Common Law, we are fully convinced that the lien of a judgment, older than that of a factor, ought to prevail over it.

Let the judgment of the Court below be reversed.