**JAMES TALCOTT, INC., Plaintiff-Appellee,**

v.

**ASSOCIATES CAPITAL COMPANY, INC., Defendant-Appellee,**

and

**The Highway Equipment Company, Defendant-Appellant.**

No. 73-1388.

United States Court of Appeals, Sixth Circuit.

Feb. 14, 1974.

Charles G. Heyd, Bauer, Morelli & Heyd, Cincinnati, Ohio, on brief, for The Highway Equipment Co.

Edmund J. Adams, Cincinnati, Ohio, on brief, for Associates Capital Co., Inc.; Frost & Jacobs, Cincinnati, Ohio, of counsel.

James W. Farrell, Jr., Cincinnati, Ohio, Vincent B. Stamp, Dinsmore, Shohl, Coates & Deupree, Cincinnati, Ohio, on brief, for James Talcott, Inc.

Before PHILLIPS, Chief Judge, and WEICK and PECK, Circuit Judges.

JOHN W. PECK, Circuit Judge.

This action began with a complaint filed by plaintiff-appellee James Talcott, Inc. (hereinafter "Talcott"), a New York corporation engaged in commercial financing, against defendant-appellee Associates Capital Company, Inc. (hereinafter "Associates"), a Delaware financing corporation, and defendant-appellant The Highway Equipment Company (hereinafter "Highway"), an Ohio construction equipment dealer. Jurisdiction was based on diversity. Talcott's complaint sought a declaratory judgment determining that Talcott had a security interest in certain Caterpillar tractors which Highway had sold to Ronald A. Getz, Inc. (hereinafter "Getz"), and that that interest had priority over a security interest which Highway had in the same tractors and which Highway had assigned to Associates. Associates filed a cross-claim against Highway seeking, in the event Talcott's interest was declared senior to Highway's, compensation for Highway's failure to honor a repurchase agreement made by Highway in connection with the assignment to Associates. Each of the three parties moved for summary judgment. The District Court granted summary judgment in favor of Talcott on its claim and in favor of Associates on its cross-claim. Highway's motion for summary judgment was, of course, denied. Highway perfected this appeal.

. The essential facts are not in controversy. On December 4, 1968, Getz, a heavy construction contractor, executed a promissory note to Talcott giving Talcott a security interest in "all fixtures, equipment, chattels, machinery . . . and collateral of every kind, *now or hereafter owned,* bought for use and/or used by Mortgagor in his business . . . . " (Emphasis supplied.) The security agreement was filed with the Ohio Secretary of State and the proper county official on December 12, 1968. Subsequent loans were made by Talcott to Getz during 1968 and 1969, all of which were secured by the agreement of December 4, 1968.

During the early part of February, 1969, representatives of Highway and Getz commenced discussions concerning Getz's need for some heavy construction equipment. On February 3, 1969, Getz indicated to Highway that it desired to

obtain two D-9 tractors on the basis of 36 payments over a 48-month period. On February 5, the president of Getz was informed by Highway that General Electric Credit Corporation (hereinafter "GECC") might finance the D-9s on the requested terms and that Highway would have GECC contact Getz in this regard. Getz then told Highway that it needed the equipment immediately and asked if Highway would finance the D-9s if GECC would not. Although the first reaction to Getz's inquiry was negative, Highway later informed Getz that Highway would take the deal if GECC would not. Getz's reason for this particular financing arrangement was, in the words of one of Highway's salesmen, to "enable him to use the equity in the 9's and other iron [a trade term for construction equipment] as cash . . . and not to show the new rented iron as an obligations (sic)."

On February 17, 1969, Highway delivered one D-9 Caterpillar Tractor (hereinafter "Tractor I") to Getz. Highway and Getz entered into an "Equipment Lease Agreement" on February 25 under the terms of which Getz was to rent Tractor I for a guaranteed minimum period of 48 months, beginning on February 17, 1969. Appended to the lease was an "Option to Purchase" agreement which provided that the purchase price would be $92,922.00, and that in the event Getz exercised its option to purchase it would receive a credit on the purchase price for rent actually paid under the lease. In addition, Getz would be required to pay interest at the rate of $\%_{10}$ of 1% per month on the unpaid balance computed from delivery date to date of purchase.

On March 3, 1969, (more than 10 days after February 17, but within 10 days after February 25) Highway and Getz filed financing statements with the appropriate offices of the State of Ohio and the County of Richland covering Tractor I.

Highway delivered a second D-9 tractor (hereinafter "Tractor II") to Getz on March 14, 1969. An "Equipment Lease Agreement" with an "Option to Purchase" addendum nearly identical, except as to amounts and dates, to those executed for Tractor I was entered into on April 22. Under this agreement payments were to begin on March 14. Financing statements on Tractor II were filed on April 28 (more than 10 days after March 14, but within 10 days after April 22).

Getz decided to exercise its option to purchase, and on October 27, 1969, the lease agreements as to both tractors were terminated. Highway and Getz then entered into a security agreement pursuant to which Getz purchased the tractors from Highway and granted Highway a security interest in the tractors. Highway assigned this security agreement to Associates for $152,185.83, the assignment providing:

"[T]hat the facts set forth in the agreement are true, that said property is free of all liens, incumbrances and security interests of whatever nature or kind except the lien, incumbrance and security interest created by this agreement . . . that the undersigned has title to said property and has a right to transfer title thereto . . . . If any of the warranties herein contained are untrue, the undersigned will on demand purchase this agreement from the Assignee for the balance remaining unpaid thereunder."

Financing statements were filed with the proper authorities within 10 days covering the tractors and naming Getz as the debtor, Highway as the secured party, and Associates as the assignee of the secured party.

Getz failed to make the required payments, and in February of 1970 Associates repossessed the tractors. Talcott learned of the proposed public sale of the repossessed tractors and protested to Associates that Talcott held a higher priority security interest in the items. The two financing corporations agreed to submit the dispute along with the

proceeds from the sale of the tractors to the District Court.

Both the lease-option contracts and purchase contract between Highway and Getz, and the assignment agreement between Highway and Associates were entered into in Ohio and that state's laws were applied by the District Court in reaching its decision.

After receiving briefs and hearing oral argument on the motions for summary judgment, the District Court found that Talcott had a security interest in the tractors; that Talcott's interest was senior to Highway's; that Getz owed Talcott $101,357.18 which was to be satisfied out of the $120,000 realized from the sale of the tractors; that the remainder of sale proceeds, $18,642.82, was to be applied in partial payment of Getz's debt on the tractors; that Associates was entitled to demand that Highway purchase the security agreement from Associates; and that the balance unpaid on that agreement was $179,689.-74 less the partial payment of $18,642.18 and appropriate interest rebates, which sum was $140,159.36. The Court also ruled that upon satisfaction of Getz's obligation to Talcott, Associates was entitled to have assigned to it all rights that Talcott had in Getz's collateral, and upon satisfaction of Highway's obligation to Associates on the cross-claim, Highway was entitled to have assigned to it all rights in the Getz collateral.

The District Court reasoned that Talcott gained a security interest in the tractors by virtue of the "after-acquired property" clause in the 1968 Talcott-Getz agreement. Highway does not seriously challenge that reasoning, and indeed, it is clear that such a clause is valid under the Ohio Uniform Commercial Code. Ohio Rev.Code § 1309.15(C) (1962) (Uniform Commercial Code § 9-204(3)). Highway does assert, however, that it perfected a first priority purchase money security interest in the tractors under Ohio Rev.Code § 1309.-31(D) (U.C.C. § 9–312(4)), which provides that,

"A purchase money security interest in collateral other than inventory has priority over a conflicting security interest in the same collateral if the purchase money security interest is perfected at the time the debtor receives possession of the collateral or within ten days thereafter."

It is undisputed that Getz obtained possession of Tractor I on February 17, signed the lease-option agreement on February 25, and that the financing statement was filed on March 3. Similarly, Getz received Tractor II on March 14, signed the agreement on April 22, and filed the statement on April 28. Also, both agreements stated that the leases dated back to the date of the original possession. The only question that remains is when did Getz receive possession of the collateral as a "debtor" as that term is defined in the context of Ohio Rev.Code § 1309.31(D). Highway contends that the dates upon which the lease-option agreements were executed were the earliest dates that Highway and Getz could have intended that the lease agreements were security, and therefore, the financing statements were filed in a timely fashion.

The District Court answered this argument by noting that "Getz's obligation was owed in both instances on the date that he received possession, for the lease agreements stated that the lessee agreed to rent beginning on February 17, 1969 in the case of tractor 7174 and on March 14, 1969 in the case of tractor 7200 . . . ." In addition, the record fully supports Talcott's position that the parties had agreed to the terms on which Getz would obtain the tractors from Highway before they executed the formal agreements. *See* Ohio Rev.Code §§ 1302.07, 1309.01(C), 1309.15(A). Perhaps the most telling exposure of the flaw in Highway's analysis was delivered by the District Court.

"It would be a frustration of this purpose [certainty in commercial transac-

tions under the U.C.C.] to hold that a purchase money secured party can deliver goods to his debtor, delay indefinitely before entering into a security agreement which binds the debtor retroactively as of the delivery date, and still obtain a perfected security interest by filing within ten days of the agreement."

Highway urges us to consider Brodie Hotel Supply, Inc. v. United States, 431 F.2d 1316 (9th Cir. 1970) as a favorable precedent for its position. We do not see its application. Brodie sold restaurant equipment to Standard Management Company in 1959, but it was later declared bankrupt. Brodie repossessed the equipment but left it in the restaurant and with the consent of Brodie, Lyon took possession of the restaurant and began operating it. Throughout the next five months Brodie and Lyon negotiated over the price and terms under which Lyon was to purchase the equipment. Lyon borrowed money from a bank on November 2, 1964, and the bank's security interest was assigned to the Small Business Administration and a financing statement was filed. On November 12, Brodie sold the equipment to Lyon and perfected its security interest by filing a timely statement. The Ninth Circuit recognized that the first-to-file rule would apply unless Brodie could bring itself within the applicable section of the U.C.C. (which in Ohio is O.R.C. § 1309.31(D)).

The Ninth Circuit held that Brodie had fulfilled the demands of the exception provided in U.C.C. § 9–312(4) because "Although Lyon might have been liable for the reasonable rental of the equipment or for its return to Brodie, he did not owe performance of an 'obligation secured' by the collateral in question until" the agreement between the parties was entered into. *Brodie*, 431 F.2d at 1319. That is not the situation in the instant case. Here, the lease-option agreements provided that the rents would begin as of the dates of the first possession, and as pointed out above, the difference is critical.

The proposition is advanced by Highway that the prompt filing of the purchase agreement entered into on October 27, 1969, gave it a priority interest. This argument fails for the same basic reason stated above, namely, that regardless of when the agreement was entered into, Getz possessed the equipment as a "debtor" for more than ten days prior to the filing of the statement. Highway has failed to show that it complied with the provisions of Ohio Rev. Code § 1309.31(D), and therefore, Talcott's security interest, being first in time, had priority.

On an appeal from a summary judgment the record must be viewed in the light most favorable to the appellant. Steed v. Central of Georgia Ry. Co., 477 F.2d 1303 (5th Cir. 1973); Fed.R.Civ.P. 52(a) & 56(c). Highway contends that the District Court erroneously granted summary judgment in this case because there were genuine issues of material fact in dispute. We have reviewed the record and find this contention meritless. Reasonable minds could not differ in the conclusions reached by the District Court on the pleadings, affidavits, answers to interrogatories, and admissions on file.

Highway also complains that the District Court erred in the computation of the judgments awarded Talcott and Associates. These complaints are without substance.

For the reasons stated herein, the judgment of the District Court is affirmed.